Filed 6/7/16  P. v. Arroyo CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067976 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253950) |
| RENE ARROYO, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Steven J. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Rene Arroyo, Jr., of assault with a firearm (Pen. Code, § 245, subd. (a)(2))[1] and found true an allegation he personally used a firearm during the commission of the offense (§ 1192.7, subd. (c)(8)).  The jury also convicted Arroyo of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and found true an allegation he personally used a firearm during the commission of the offense (§ 1192.7, subd. (c)(23)).  Arroyo further admitted having three prior prison commitment convictions (§ 667.5, subd. (b)).  The court sentenced him to six years in prison.

Arroyo appeals, contending the court erred in denying his motion to sever the trial of the charges against him from the trial of the charges against his father.  Arroyo additionally contends the court erred in failing to declare a mistrial after the admission of evidence of Arroyo's gang affiliation.  Lastly, he contends the accumulation of these errors deprived him of a fair trial.

BACKGROUND

Arroyo's father lived in the garage of a home owned by the estate of Arroyo's deceased grandfather.  Arroyo's aunt and her family lived in the home.  One night, Arroyo's father and aunt argued over the disposition of the home.  Arroyo, who was visiting his father, stood next to his father and watched the argument.  Arroyo's father grabbed Arroyo's aunt by her hair and hit her right shoulder.  As she picked up a phone and called 911, Arroyo's father asked Arroyo for a gun.  Arroyo pulled out a gun from

---

[1]     Further statutory references are to the Penal Code unless otherwise stated.

inside his clothes and handed it to his father. Arroyo's father pointed the gun at Arroyo's aunt. He told her he was going to kill her and lay her next to their deceased mother.

Around that time, Arroyo's uncle arrived to investigate the confrontation. Arroyo's father handed Arroyo the gun and told Arroyo to "smoke him" or "shoot him." Arroyo pointed the gun at his uncle. Arroyo's aunt moved to stand in front of Arroyo's uncle and Arroyo pointed the gun at her. Arroyo's uncle quickly diffused the situation and Arroyo and his father left the home.

While Arroyo's father lived at the home, prison inmates sent mail to him. One item of mail contained a check for $400. After the above incident, Arroyo's aunt began rejecting the mail, which made Arroyo's father angry. He called her home and threatened to kill her. A week or two after the incident, Arroyo went to his aunt's home to pick up his father's mail. His aunt told him she did not have his father's mail. She also told him the police were looking for him. He laughed and thanked her for letting him know.

About two months after the incident, Arroyo's father unexpectedly barged into the home, ran over to Arroyo's aunt, and started hitting her left side and the back of her head with his fist. Arroyo's cousin came into the room, ran to Arroyo's father, and stabbed his lower left ribs twice with a knife. Arroyo's father stopped, noticed himself bleeding, started going toward Arroyo's aunt again, stopped again, and then left through the front of the home.

The parties stipulated Arroyo and his father had each been convicted of a felony in California within the seven years preceding the trial.

3

I

The prosecutor jointly charged Arroyo and his father with crimes related to the first incident. The prosecutor also charged Arroyo's father with crimes related to the second incident. Before trial, Arroyo moved to sever the trial of the charges against him from the trial of the charges against his father. Arroyo sought the severance because he believed the jury would be inflamed by limited gang evidence being admitted against his father as well as the circumstances of the second incident, which involved physical violence and injury. The court denied the motion, but indicated it would instruct the jury Arroyo had no charges related to the second incident.

In the midst of the prosecution's case-in-chief, one of the jurors sent the court a note requesting a reminder of the charges against Arroyo and his father. With the parties' agreement, the court reread the information. While doing so, the court emphasized none of the charges against Arroyo related to the second incident.

In addition, after the close of evidence, the court instructed the jury with a tailored version of CALCRIM No. 203 as follows: "Because more than one defendant is on trial here, I am going to remind you which individuals are charged with which crimes. [¶] [Arroyo's father] is charged with the charges and allegations as set forth in Counts One, Two, Three, Four, Five and Seven of the information. [¶] [Arroyo] is charged with Assault with a Firearm, with specified allegations as alleged in Count Two and Possession of a Firearm by a Felon, with specified allegations, as alleged in Count Four. [¶] You must separately consider the evidence as it applies to each defendant. You must

4

decide each charge for each defendant separately.  If you cannot reach a verdict on both of the defendants, or on any of the charges against any defendant, you must report your disagreement to the court and you must return your verdict on any defendant or charge on which you have unanimously agreed.  [¶] Unless I tell you otherwise, all instructions apply to each defendant."

The court also instructed the jury with CALCRIM Nos. 304, 305, and 3515.  The CALCRIM No. 304 instruction stated, "I instructed you during the trial that certain evidence was admitted only against a certain defendant.  You must not consider that evidence against any other defendant."

The CALCRIM No. 305 instruction stated, "You have heard evidence that each defendant made a statement before trial.  You may consider that evidence only against him, not against any other defendant."

The CALCRIM No. 3515 instruction stated, "Each of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each."

## II

Arroyo contends the court prejudicially erred in denying his severance motion because of the risk the evidence related to the second incident would inflame the jury against him.[2]  " 'We review a trial court's denial of a severance motion for abuse of

---

[2]     Arroyo arguably waived this contention by his subsequent conduct.  (See *Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176, 1179 [waiver, or the intentional relinquishment of a known right, may be implied from conduct manifesting an intent to

discretion based upon the facts as they appeared when the court ruled on the motion.'

[Citations.] 'If we conclude the trial court abused its discretion, reversal is required only

if it is reasonably probable the defendant would have obtained a more favorable result at

a separate trial.' [Citations.] 'If the court's joinder ruling was proper when it was made,

however, we may reverse a judgment only on a showing that joinder " 'resulted in "gross

unfairness" amounting to a denial of due process.' " ' " (*People v. Souza* (2012) 54

Cal.4th 90, 109 (*Souza*).)

The parties do not dispute there was nothing inherently improper about jointly

trying Arroyo's father for the charges related to both incidents. A court may jointly try a

defendant for different offenses involving different transactions or events if the offenses

are of the same class. (§ 954.)[3] The parties also do not dispute there was nothing

inherently improper about jointly trying Arroyo and his father, notwithstanding the

additional charges against his father. Indeed, a court generally must jointly try two or

more defendants who are jointly charged with the same offense. (§ 1098; *People v.*

---

waive]. Specifically, after the jury was sworn, but before the prosecutor began presenting
evidence, Arroyo's father's counsel fell ill, necessitating the trial be recessed as to
Arroyo's father. Arroyo had the opportunity to either proceed to trial on his own,
stipulate to a mistrial, or waive time until he and his father could be tried together.
Rather than proceed to trial on his own, which would have given him the severance he
sought, he chose to waive time or stipulate to a mistrial so he could be tried with his
father.

[3] Section 954 provides in part: "An accusatory pleading may charge two or more
different offenses connected together in their commission, or different statements of the
same offense or two or more different offenses of the same class of crimes or offenses,
under separate counts."

6

*Chapman* (1959) 52 Cal.2d 95, 97.)[4] Joint trials are legislatively preferred because they promote judicial economy and efficiency. They also serve the interests of justice by avoiding inconsistent verdicts. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 99 (*Mackey*).) Since Arroyo and his father were charged with common crimes involving common events and victims, this case presented a classic case for a joint trial. (*Souza*, *supra*, 54 Cal.4th at p. 110; *Mackey*, *supra*, at p. 99.)

Nonetheless, " '[t]he court may, in its discretion, order separate trials [of defendants] if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses.' [Citations.] 'Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." ' " (*Souza*, *supra*, 54 Cal.4th at p. 109.) "[S]everance may [also] be granted based on ' "prejudicial association with codefendants." ' " (*Mackey*, *supra*, 233 Cal.App.4th at p. 99.)

However, "there is no rule that separate trials must be granted whenever evidence of the bad acts of a codefendant is admissible. [Citations.] To allow severance whenever a codefendant's unsavory background might reflect poorly on another defendant would result in severance in so many cases that it would defeat the professed legislative preference for joint trials." (*Mackey*, *supra*, 233 Cal.App.4th at p. 102.) Rather, "[t]o

---

4      Section 1098 provides: "When two or more defendants are jointly charged with any public offense … they must be tried jointly, unless the court order separate trials."

7

justify severance the characteristics or culpability of one or more defendants must be such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue." (*People v. Bryant* (2014) 60 Cal.4th 335, 383; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.)

"In deciding the severance issue, the trial court must determine whether 'the realistic benefits from a consolidated trial are outweighed by the likelihood of "substantial" prejudice to defendant.' [Citation.] 'In determining the degree of potential prejudice, the court should evaluate whether (1) consolidation may cause introduction of damaging evidence not admissible in a separate trial, (2) any such otherwise-inadmissible evidence is unduly inflammatory, and (3) the otherwise-inadmissible evidence would have the effect of bolstering an otherwise weak case or cases.' [Citation.] That balancing process is a ' "highly individualized exercise." ' [Citation.] Less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice." (*Mackey*, *supra*, 233 Cal.App.4th at pp. 99-100.)

Here, the record does not show the evidence against Arroyo's father, which included the second incident and general information about the Mexican Mafia criminal prison gang (see pt. III, *post*), portrayed Arroyo's father so reprehensibly the jury would have found Arroyo guilty simply by association. While the evidence tended to show Arroyo's father appeared more violent and rash than Arroyo, Arroyo's counsel highlighted this contrast throughout the trial as it aided Arroyo's defense. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 933 [the court did not err in denying severance where

8

evidence of codefendant's gang affiliation was more useful than prejudicial as it tended to make codefendant appear more culpable], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

The record also does not show the evidence against Arroyo's father was stronger than the evidence against Arroyo. Instead, the evidence against each of them was equivalent, and the evidence against Arroyo was independently sufficient to support his convictions.

In addition, the jury was explicitly reminded throughout the trial by the court and through the strategic cross-examination of witnesses by Arroyo's counsel that Arroyo had no involvement in the second incident. Moreover, the court instructed the jury to separately consider the evidence against each defendant and to reach a verdict as to each defendant solely based upon the evidence against that defendant. We presume the jury followed this instruction. (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 152.) Arroyo has not rebutted this presumption, as he has not identified anything in record showing the jury was unwilling or unable to independently assess the respective culpability of him and his father. Accordingly, Arroyo has not established the court prejudicially erred in denying his severance motion.

### III

### A

Before trial, the prosecutor filed a motion to admit expert evidence Arroyo and his father were affiliated with the East San Diego criminal street gang and his father was an associate of the Mexican Mafia criminal prison gang. The court denied the motion as to

9

Arroyo, but granted the motion as to Arroyo's father. One of the charges against Arroyo's father was making a criminal threat (§ 422), which has a reasonable fear element (*People v. Toledo* (2001) 26 Cal.4th 221, 227). The court noted Arroyo's aunt feared Arroyo's father because she believed he was a gang member and the gang evidence was relevant to set up the predicate for her state of mind. Nonetheless, the court limited the evidence to Arroyo's father's membership in a criminal street gang and a prison gang, without references to the specific gang names. The parties understood the court's ruling to mean the prosecutor could present expert testimony about gangs and gang membership generally, but could not present any expert testimony indicating Arroyo and his father were documented gang members.

At trial, Arroyo's aunt testified she believed Arroyo's father was a gang member and only associated with gang members. She explained that he had a paper with codes on it and he told her he had to get the codes out to people. She believed he was referring to gang members because he told her about the codes right after he had been released from prison.

A gang expert later testified about the difference between a criminal street gang and a criminal prison gang. The expert also testified about the Mexican Mafia criminal prison gang, including its membership and hierarchy, its methods of communicating inside and outside of prison using codes, and its laundering of drug proceeds by having money sent to and from prisoner accounts.

Arroyo's counsel did not cross-examine the gang expert; however, Arroyo's father's counsel asked the expert about the expert's knowledge of Arroyo and Arroyo's

father's status as gang members. The expert testified he did not research them and did not know anything about their status.

The prosecutor believed and the court agreed this line of questioning and the manner in which it was done created a false impression Arroyo and his father were not gang members. The prosecutor requested the parties stipulate Arroyo's father was a gang member. Instead of granting the request, the court told the prosecutor she could ask the gang expert on redirect what he was asked to do and how he prepared.

Arroyo's counsel objected to any questioning of the gang expert as to anything he may or may not have been asked to do with reference to Arroyo because there was no gang connection to the charges against Arroyo. Before the court could address this concern, Arroyo's counsel moved for a mistrial.

The court responded, "You're going to ask for a mistrial because the guy testified that he doesn't know whether or not your guy is a member of a gang?" Arroyo's counsel replied, "It's not so much that, your honor. It's—my concern is that somehow opening the door has opened the door for further inquiry as to whether my client is a gang member. [¶] We covered this in limine, and there's absolutely no relevance to my client being in a gang. He has nothing to do with this check. He has nothing to do with any letters. He has nothing to do with their level of fear because he's not charged with anything that has anything to do with [Arroyo's aunt's] level of fear of my client. [¶] That's my concern. It's just—it should be clean and left alone as to my client."

The court asked the prosecutor, "Have any problem with that?" She replied, "No."

11

After both defense counsel assured the court and the prosecutor they would not exploit the situation by arguing in closing that there was no evidence their clients were gang members, the court ruled: "With this witness, I think you can—you can go along the lines of what I've suggested. You contacted him yesterday, he knows about gangs in general, that's what he was here to testify about, and he does not know whether or not [Arroyo's father] or anybody involved in this case is or is not a member of a gang. That's not what he was asked to do, and leave it at that."

When the trial resumed, the prosecutor had the expert clarify that the prosecutor had only asked him to testify about gang members generally. The prosecutor had not asked him to conduct any investigation into Arroyo's father's background.

B

Arroyo contends the court erred in implicitly denying his mistrial motion because highly prejudicial and irrelevant gang evidence had been indirectly admitted against him through the gang expert's testimony and no curative instruction was given. We disagree.

"A motion for ' "mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction." ' " (*People v. Montes* (2014) 58 Cal.4th 809, 888.) We review the denial of a mistrial motion for abuse of discretion. (*Id.* at p. 884.)

In this case, Arroyo's counsel moved for a mistrial preemptively because he was concerned the court might allow further questioning of the gang expert as to Arroyo and he believed any such further questioning, even to confirm the expert did not know whether Arroyo was a gang member, would prejudice Arroyo. Although the court did

not expressly grant or deny the motion, the court effectively eliminated the grounds for the motion by obtaining the prosecutor's acquiescence to Arroyo's counsel's concerns and limiting what she could ask the gang expert on redirect. Consistent with her acquiescence to Arroyo's counsel concerns and the court's direction to her, the prosecutor limited her redirect questions solely to Arroyo's father. Thus, to the extent the court's actions may be considered an implicit denial of the mistrial motion, we cannot conclude from these circumstances the denial was an abuse of discretion.

IV

Finally, Arroyo contends we must reverse his conviction because the accumulation of the above claims of error deprived him of a fair trial. Because we have rejected the above claims of error, we must necessarily reject Arroyo's cumulative error claim as well. (*People v. Vieira* (2005) 35 Cal.4th 264, 294; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

13

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.